**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-222 (CRC)** |
| **v.** | : | |
| | : | |
| **RYAN KELLEY,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Ryan Kelley to three months' incarceration, 12 months' supervised release, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Ryan Kelley, a 42-year-old real estate broker, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Kelley pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1). As explained herein, a sentence of three months' incarceration and 12 months' supervised release is appropriate in this case because Kelley: (1) was with the group of rioters who breached the scaffolding adjacent to the Northwest stairs; (2) ignored warning signs to leave the restricted Capitol grounds (including flash bang grenades, chemical irritants, and human blood on the Northwest stairs); (3) encouraged and assisted other rioters, including by shouting into the crowd, repeatedly gesturing to other rioters to move closer to the Capitol Building and police, and by supporting another rioter who was passing forward a  metal bike rack to rioters closer to police; (4) damaged property (ripping a protective tarp covering the scaffolding adjacent to the Northwest stairs); (5) climbed through scaffolding and ran up the railing next to the Northwest stairs; (6) took photos and video of the scenes of chaos and rioters rushing and attacking officers; (7) spent almost two hours on restricted Capitol grounds; and (8) has failed to express sincere remorse.

The Court must also consider that Kelley's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Kelley's crime support a sentence of three months' incarceration and 12 months' supervised release.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 39 ("Statement of Offense"), at ¶¶1-7.

*Defendant Kelley's Role in the January 6, 2021 Attack on the Capitol*

Ryan Kelley, traveled from his home in Allendale, Michigan to Washington, D.C., to attend the "Stop the Steal" rally.  Statement of Offense ¶ 8.  On January 6, 2021, Kelley attended the rally and then joined protestors as they marched to the U.S. Capitol Building. *Id.* At approximately 1:30 p.m., Kelley was part of a crowd gathering at the West Plaza near the northwest scaffolding (erected in support of construction for the then-upcoming Presidential Inauguration), within the restricted perimeter. *Id.* at ¶ 9. Multiple red flags warned Kelley that remaining on restricted grounds was impermissible. For instance, while he was on the West Plaza, multiple flash bang grenades exploded near Kelley. A line of police officers stood between rioters and the Capitol Building and rioters shouted, "fucking traitors" and other epithets against the police. *See* Exhibit 1 at 0:00-0:27. Image 1 shows a flash bang grenade exploding behind Kelley and Kelley appearing

to acknowledge it by looking back, while a police line can be seen a few rows in front of him. Image 2 shows another flash bang grenade exploding near Kelley, who can be seen in the smoke.

 

*Image 1*
(Screenshot from Exhibit 1 at Timestamp 00:05)

*Image 2*
(Screenshot from Exhibit 1 at Timestamp 00:20)

Over the next twenty minutes, Kelley and other rioters rushed past U.S. Capitol Police ("USCP") officers and started climbing the northwest scaffolding. Statement of Offense ¶ 9. First, Kelley moved closer to the scaffolding, that was covered by a large white tarp, adjacent to the Northwest stairs. There, Kelley shouted towards the already riled up crowd. *See* Exhibit 2 at 5:14-5:16. Image 3 shows Kelley with his hands cupped around his mouth as he was shouting into the crowd of rioters.



*Image 3*
(Screenshot from Exhibit 2 at Timestamp 05:15)

Kelley then positioned himself near the front of the mob, only rows away from officers. He began filming as the mob gathered in front of and soon overtook police. *See* Exhibit 2 at 5:34-6:05. Rioters forced the police back and up the steps directly underneath the tarp-covered scaffolding. *Id.* Image 4 shows Kelley videorecording only rows away from officers as the mob began advancing against them.



*Image 4*
(Screenshot from Exhibit 2 at Timestamp 05:39)

Publicly available video footage shows that, after rioters forced the police officers up the steps underneath the scaffolding, officers continued to fend off the rioters, pushing against them with riot shields. Exhibit 3 at 01:56-02:06. Meanwhile, Kelley and other rioters were climbing through the scaffolding. *See* Exhibit 3 at 1:59-2:02. Image 5 shows Kelley and other rioters climbing through the scaffolding which was still covered by the large white protective tarp.



*Image 5*
(Screenshot from Exhibit 3 at Timestamp 02:00)

At approximately 2:00 p.m., after climbing through the scaffolding, Kelley climbed onto an architectural feature next to the Northwest stairs and began gesturing to the crowd below by waving his hand towards the stairs leading up to the Capitol Building. Statement of Offense ¶ 9; *see also* Exhibit 4 at 0:08-0:18. The rioters Kelley encouraged to move forward were also passing forward sections of metal bike racks that police had installed as barricades. *See* Exhibit 6. Image 4 shows Kelley gesturing to rioters to move forward towards the Capitol Building.



*Image 6*
(Screenshot from Exhibit 4 at Timestamp 00:09)

Kelley then used his hands to support another rioter who was pulling a metal bike rack onto the scaffolding. Statement Of Offense ¶ 9; Exhibit 5 at 12:32-12:35 (USCP closed-circuit television ("CCTV") footage of the Northwest stairs and adjacent scaffolding). The bike rack had a sign on it stating, "property of U.S. Capitol Police." *Id.* Image 7 shows Kelley supporting a rioter who is having difficulty passing forward a metal bike rack to rioters closer to the police.



*Image 7*
(Enlarged Screenshot from Exhibit 5 at Timestamp 12:33)

After helping rioters pass the bike rack forward, Kelley made hand gestures encouraging additional rioters to move forward and applauded their efforts – clapping to cheer them on.  Exhibit 5 at 14:40-14:47. At approximately 2:05 p.m., USCP CCTV footage shows that Kelley then began using his hands to help tear the white tarp covering the scaffolding, thereby damaging property. Exhibit 5 at 18:44-19:36. Specifically, Kelley put his hands into a hole that had already been cut into the tarp and pulled on the tarp. As another rioter grabbed and tried to pull some of the tarp away, Kelley appeared to point to a spot on the tarp, as if instructing the other rioter on how best to tear it away.  Kelley then held the tarp as a second rioter jumped up and cut the tarp above where Kelley was holding it. After the other rioter finished cutting the tarp, Kelley pulled it forcibly and a portion of the tarp came loose in his hand. Kelley then lifted that portion of the tarp in the air triumphantly and threw it in a tree. He then went back to tearing at the tarp a few more times.

9

Image 8 shows Kelley holding the tarp while it is being cut and him beginning to rip piece of the tarp away.



*Image 8*
(Enlarged Screenshot from Exhibit 5 at Timestamp 19:14)

Publicly available news footage confirmed that Kelley used his hands to tear and pull off a portion of the tarp covering the scaffolding. Exhibit 6; *see also* Statement of Offense ¶ 10. Image 9 shows Kelley tearing of a portion of the tarp covering the scaffolding.[2]

---

[2] The violent and raucous actions of rioters around the Capitol, and the uncontained threat they represented, resulted in the evacuation of then-Vice President Pence from the Capitol about six minutes later, at approximately 2:11 p.m.



*Image 9*
(Screenshot from Exhibit 6 at Timestamp 00:05)

Kelley also briefly covered his face with his shirt to protect himself from pepper spray or other chemical irritant in the air. Exhibit 5 at 20:50-20:56. He also continued gesturing to the crowd, consistently beckoning them toward the stairs that led to the entrance to the Capitol Building. Statement of Offense ¶ 10.  He also used his cell phone to take a photograph of blood that was on the architectural feature. *Id.*; *see also* Exhibit 7 at 10:18-10:26.



*Image 10*
(Screenshot from Exhibit 7 at Timestamp 10:23)

Later, Kelley also climbed onto a stair railing next to the Northwest stairs and ran up the railing towards the Capitol Building. Statement of Offense ¶ 10; *see also* Exhibit 8 at 7:47-8:00. As rioters at the top of the steps rushed towards officers, they held various objects, including riot shields taken from police. *Id.* Image 11 shows Kelley running up the railing of the Northwest stairs.



*Image 11*
(Screenshot from Exhibit 8 at Timestamp 07:57)

Several minutes after he first arrived at the West Plaza, Kelley arrived at the top of the stairs and entered the Capitol's Northwest Courtyard. Statement of Offense ¶ 10.  At approximately 2:15 p.m., while in the Northwest Courtyard, Kelley continued to gesture and motion to encourage the rioters to move towards the Capitol Building. *See* id. ¶ 10; *see also* Exhibit 9 at 05:43-05:50 (CCTV footage of rioters at the Northwest Courtyard).



*Image 12*
(Enlarged Screenshot from Exhibit 9 at Timestamp 05:45)

Kelley spent almost two hours on restricted Capitol grounds. Statement of Offense ¶ 10. The government has not discovered any evidence that Kelley ever entered the Capitol Building.

*Social Media Posts*

For two years, Kelley posted statements on Facebook and other social media, making light of the riot, falsely denying that any violence took place, and insisting that he engaged in no wrongdoing. For instance, on June 30, 2021, Kelley posted a message to Facebook stating that "Jan 6 in Wash DC was not an insurrection. Zero nukes, F-15's or any weapons, one guy did have an assult [sic] pencil tho it remained unused." *See* Exhibit 10. On December 27, 2021, Kelley posted a message to Facebook stating, "I was in Washington DC on January 6 protesting the government because of the fraudulent 2020 election… doing the right thing." *See* Exhibit 11. On August 12, 2022, Kelley posted another message to Facebook stating, "I did nothing wrong" on January 6. *See* Exhibit 12. On December 2, 2022, Kelley posted another message to Facebook in

which he claimed that "J6" was an FBI "set up." *See* Exhibit 13. Additionally, as of October 9, 2023, Kelley's website, Ryandkelley.com, contained a statement that "The Federal government is still coming after me and many others for peacefully protesting our government on January 6, 2021." *See* Exhibit 14.

*The Charges and Plea Agreement*

After charging Kelley in a four-count criminal complaint on June 8, 2022, the United States charged Kelley on June 22, 2022 by a four-count Information with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Knowingly Engaging in any Act of Physical Violence Against Person or Property in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); and Destruction of Government Property, in violation of 18 U.S.C. §§ 1361 and 2. On July 23, 2023, pursuant to a plea agreement, Kelley pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § § 1752(a)(1). By plea agreement, Kelley agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Kelley now faces a sentencing on a single count of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Kelley faces up to one year of imprisonment and a fine of up to $100,000. Kelley must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Kelley's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)[3] | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| *Total Adjusted Offense Level* | *4* |

*See* PSR ¶¶ 33-43.  This is the same Guidelines calculation to which the parties stipulated in the plea agreement.[4] Plea Agreement ¶ 5A.

## I.    Proposed Guidelines Amendment, U.S.S.G. § 4C1.1

The Sentencing Commission has proposed an amendment to the Sentencing Guidelines, effective November 1, 2023 that, if adopted, will be codified at U.S.S.G. § 4C1.1.  The PSR notes

---

[3] This specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).

[4] The total offense level is listed in the plea agreement as 6. Plea Agreement ¶ 5A. However, there appears to have been a scrivener's error, as the plea agreement otherwise matches the calculations in the PSR: base offense level is 4, the specific offense characteristic adds 2 levels, and acceptance of responsibility removes 2 levels.  Accordingly, the total offense level for Kelley after acceptance of responsibility would appear to be 4.

The PSR also correctly notes this typo/inconsistency in the plea agreement.  PSR ¶¶ 91-92.

that the Court "could" apply a 2-level reduction via a downward variance for criminal history based on that proposed amendment. *See* PSR ¶ 115(b). As explained below, the Court should not grant such a variance.

Because its effective date has not yet arrived, proposed § 4C1.1 does not apply to Kelley's sentence, as other judges have acknowledged in January 6 cases. For example, in *United States v. Griffith*, 21-cr-244 (CKK), and *United States v. Galetto*, 21-cr-517 (CKK), Judge Kollar-Kotelly recently rejected the application of § 4C1.1 on the grounds that this section has not yet been formally adopted. Judge Bates made the same observation in *United States v. Sheppard*, 21-cr-203 (JDB). He also stated that he would have imposed the same sentence even if § 4C1.1 had applied. Judge Bates again refused to apply proposed § 4C1.1 in *United States v. Nassif*, 21-cr-421 (JDB), where the defendant was convicted of violations of 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G).

This approach is consistent with the U.S. Code and case law. *See* 28 U.S.C. § 994(p); *Stinson v. United States*, 508 U.S. 36, 41 (1993) ("Amendments to the Guidelines must be submitted to Congress for a 6-month period of review, during which Congress can modify or disapprove them."). Absent Congressional action, the amended Guideline will not take effect until November 1, 2023. Moreover, courts are required to apply the version of the Guidelines in effect at the time of sentencing. *See* 18 U.S.C. § 3553(a)(4)(A)(ii); Sentencing Guidelines § 1B1.11(a). Finally, the Commission has the authority to decide whether a new Amendment applies retroactively. 28 U.S.C. § 994(o). As the Commission has acted to apply this proposed Guideline retroactively on or after February 1, 2024, the defendant will thus have an opportunity to seek a sentence reduction under 18 U.S.C. § 3582(c)(2), after February 1, 2024.

While the Court has the authority presently to vary downward by two levels for defendants who the Court determines would otherwise be subject to proposed § 4C1.1, the Court should not do so in this case. While proposed § 4C1.1 will arguably apply to future defendants who do not engage in violence or threats of violence, the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioter contributed to that disruption. Because [defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). The government is not aware of any judge in a January 6 case issuing a lower sentence than it would otherwise have imposed based on proposed § 4C1.1.

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree

to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. Due to the unique nature and extensive harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that this Court should not grant a downward variance based on the policy behind proposed § 4C1.1. And if the Court determines that proposed § 4C1.1 applies to this case, notwithstanding its future effective date, the government requests that this Court vary upwards by 2 levels to account for those considerations.

Finally, to avoid unnecessary litigation, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether proposed § 4C1.1 applies. To the extent the Court does apply § 4C1.1, we also request that this Court foreclose any additional retroactive reductions after November 1, 2023 pursuant to this guideline.

The U.S. Probation Office calculated Kelley's criminal history as a Category I. PSR ¶¶ 8, 46, 84. Accordingly, the U.S. Probation Office calculated Kelley's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR ¶¶ 43, 86. Kelley's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's Guidelines imprisonment range of 0-6 months.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of three months' incarceration, 12 months' supervised release, 60 hours of community service, and $500 in restitution.

A.  **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Kelley's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Kelley, the absence of violent or destructive acts is not a mitigating factor. Had Kelley engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors here is that Kelley damaged property while on restricted Capitol grounds. This separates him for the least culpable members of the riot who engaged in trespass or parading and demonstrating on restricted grounds during the riot but did not damage property. Furthermore, the property damage was significant. Kelley helped to rip and remove a portion of the tarp that was covering the scaffolding. Even though his rip of the tarp was relatively modest, it extended an already existing hole in the tarp and widened the opening through which some rioters advanced on the Capitol Building. Rioters overtook police officers at the top of the

20

stairs only minutes after the Kelley's ripping of the tarp.  *See* Exhibit 5 at 18:44-19:36 (ripping of the tarp) and at 22:45-23:10 (rioters overtaking officers at the top of the Northwest stairs).

Also, while Kelley did not directly engage in violence, he encouraged, facilitated, and celebrated violence at the Capitol.  He shouted into the already riled up crowd; he consistently beckoned the crowd of rioters forward, closer towards the Capitol Building and police; he supported another rioter as he was moving a metal bike rack towards the front of the mob on the Northwest stairs, towards those rioters who were closer to officers; and he took a photograph of human blood by the stairs.

Kelley also ignored warning signs to leave restricted Capitol grounds from the very beginning, including flash bang grenades, chemical irritants, and later, human blood. He also gleefully took part in the chaos, climbing through scaffolding and running on top of railing, taking photos and videos of rioters' clashes with officers, and indulging himself for almost two hours on restricted Capitol grounds.  Finally, Kelley was with the first rioters to breach the scaffolding adjacent to the Northwest stairs, while Vice President Pence and both houses of Congress were still in the building, making the mob's presence more perturbing.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Kelley

As set forth in the PSR, Kelley has no criminal history. PSR ¶ 44-46. He is a real estate broker who co-owns and co-operates (with his wife) a business which sells and buys commercial and residential property. PSR ¶ 69. Despite his lack of criminal history, Kelley has displayed a troubling lack of remorse for his actions indicating that has not yet learned a lesson or grasped the

gravity of the events he participated in, as discussed further below in the "Specific Deterrence" section of this memo.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Although Kelley presented a well-crafted written statement to Probation about the instant offense (PSR ¶ 32), the statement falls short of expressing remorse. It focuses on communicating the desire for civic engagement which led Kelley to Washington, D.C., but it does not address the distressing behavior that he engaged in while at the Capitol or show any regret or sorrow for his decisions. To the extent that the Court does feel that any portion of Kelley's statement expresses remorse ("I noticed protestors engaging in physical altercations with law enforcement, and admittedly, should have left the protest." PSR ¶ 32), such expressions are belied by consistent social media statements made by Kelley, confirming that he still believes he did nothing wrong. That failure to express remorse calls for a significant term of incarceration to specifically deter Kelley from any participation in future, politically inspired property damage or violence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence Kelley based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Kelley has pleaded guilty to Count One of the Superseding Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although the other defendants discussed below also participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who engaged in property destruction, specifically tearing the protective tarp over the scaffolding in the West Plaza, to jail time. For instance, in *United States v. Mick Chan*, 1:21-CR-668 (TNM), the defendant was convicted of violating 18 U.S.C. § 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(G). Similar to Kelley, Chan (1) facilitated the breach of the Northwest staircase by

destroying government property, namely, the tarp covering the scaffolding between the Northwest stairs and the inaugural stage; (2) was aware that police were using various means to disperse rioters (Chan was hit in the face with a pepper spray ball, while Kelley was aware of officers using flash bang grenades and chemical irritants); (3) took photos of some of the warning signs that he should leave restricted Capitol grounds (Chan took a photo of a pepper ball and Kelley took a photo of blood by the breached Northwest stairs); (4) endangered the safety of police by aiding other rioters in lifting bike racks onto the Northwest staircase; and (5) refused to acknowledge his role in or wrongdoing on January 6th (Chan maintained that January 6th was an "inside job" and that police use of non-lethal munitions against him and the crowd was "unjustified," and Kelley similarly asserted that January 6th was a "set up" by the FBI and that rioters were "peacefully" protesting).  Distinct from Kelley, Chan also entered the Capitol Building and did not receive credit for acceptance of responsibility, as Chan went to trial. Judge McFadden gave Chan a sentence of 3 months' incarceration and 12 months' supervised release, along with 5 months' home detention (not requested here).

In *United States v. Neil Ashcraft.* 1:22-CR-00295 (CKK), the defendant pled guilty to a misdemeanor charge of violating 18 U.S.C. § 1752(a)(1) and a felony charge of violating 18 U.S.C. § 641 (Entering and Remaining in a Restricted Building or Grounds and Theft of Government Property, respectively). Similar to Kelley, Ashcraft (1) climbed scaffolding on the West Plaza and used his heightened perch to encourage other rioters; (2) destroyed government property, specifically cutting the tarp covering the scaffolding (using a knife), which facilitated rioters seeing into and though the scaffolding; and (3) took photos while at the Capitol.  Ashcraft did engage in some more serious conduct than Kelley did. For instance, Ashcraft carried pepper spray; entered the Capitol Building; stole water from a jug, a flag, and a flagpole; and tried to destroy the things

he stole. However, unlike Kelley, Ashcraft expressed remorse for his conduct on January 6th and was cooperative with law enforcement officials, including being "unusually forthcoming" during his interview with the FBI and agreeing to plead guilty via a pre-arrest, pre-indictment plea agreement. Govt. Sentencing Memorandum, 1:22-CR-295, ECF 20 at 14.  Additionally, Kelley, unlike Ashcraft, aided another rioter in lifting a bike rack onto the Northwest staircase. Judge Kollar-Kotelly sentenced Ashcraft to 80 days' imprisonment for each count, to run concurrently, along with 12 month's supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kelley must pay $500 in restitution, which reflects in part the role Kelley played in the riot on January 6th.[7] Plea Agreement at ¶ 15. The Plea Agreement reflects that the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Kelley's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 111.

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to three months' incarceration, 12 months' supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Michael L. Jones*

MICHAEL L. JONES
DC Bar No. 1047027
Trial Attorney
Capitol Riot Detailee
U.S. Attorney's Office
District of Columbia
(202) 252-7820
michael.jones@usdoj.gov

By:     */s/ Shanai Watson*

SHANAI WATSON
Trial Attorney, Department of Justice
1301 New York Ave. N.W., Washington, DC 20005
New York Bar Reg. No. 5003165
(202) 616-0245
shanai.watson@usdoj.gov